We will hear argument first this morning in Case 25-466, Sweepitch v. Securities and Exchange Commission. Mr. Geiser. Thank you, Mr. Chief Justice, and may it please the Court. According to Section 78U's Plain Text, History, Structure, and Purpose, the SEC cannot seek disgorgement without showing investors suffered economic harm. This Court in lieu directly confronted the meaning of disgorgement, traced its common law roots, and established its traditional bounds. It confirmed that disgorgement could not be a penalty or deterrent, and it was limited to restoring the status quo and providing fair compensation to injured investors. Congress acted against that backdrop to codify disgorgement in Subsection D-7. It did so by including the very term that we had just defined without any further guidance or modification. It simply took that term of art and placed it in the statute, and it separately paired disgorgement with penalties. It has two different remedies with separate functions, one punitive and the other remedial. Yet the government now maintains that Congress, in its post-lieu amendments, fundamentally redefined the core meaning of disgorgement. The government says disgorgement can serve as a penalty. It can focus solely on depriving wrongdoers and deterring misconduct, and the government can act without any remedial purpose, with no obligation to restore the status quo or return a single penny to investors. The government is wrong. It would override critical limits on the SEC's enforcement power. It would permit an unbounded form of disgorgement rejected by this court and unmoored from its traditional roots. It would treat disgorgement as indistinguishable from a penalty in a provision that separately provides for penalties and draws a textual and functional distinction between penalties and disgorgement. It would assign windfalls to uninjured investors who Congress already determined have no right to these very funds, and it would let the government subvert the substantive and procedural safeguards, including a jury trial, that protect defendants against SEC overreach and abuse. To be sure, we are not saying that wrongdoers have a right to keep the proceeds from their violations, but we are saying that the SEC has to go through the rules and hoops for civil penalties when it seeks to punish a defendant rather than restore funds to parties with actual injuries. I welcome the Court's questions. In your view, what is the difference between disgorgement and compensatory damage? I think there is an important distinction. Disgorgement is about identifying an asset before the Court that rightfully belongs to someone else. Damages are seeking to make an injured party whole. I thought you were pegging your argument to the existence of an injured party. We certainly are, Your Honor, but you need some party with a right or entitlement to the asset before the Court in order for disgorgement to have a compensatory function. It is possible that in some cases disgorgement and damages will overlap, but there are obviously important distinctions, including that disgorgement is capped by net proceeds. Again, if an injured party is only entitled to part of the asset before the Court, then disgorgement is limited to that part of the asset. If you go beyond that, you cross the line into a penalty and a windfall. Let's take a step back. This seems to rely quite a bit on Lew, right? That's right. The world has changed in this area since Lew, and disgorgement is now in what, Section 7? That's correct. It has a different statute of limitations. Do you think it's still an equitable remedy? Absolutely, Your Honor. It's not in the equitable section, which is Section 5, right? It's not in Section 5. Congress gave it a new home in Section 7 so that it could make a home. Well, as far as I was concerned, it was homeless to begin with. Well, you're not necessarily wrong, but in light of the Court's reading in Lew, it said disgorgement is an equitable remedy, and Lew is very clear about what Congress needed to do if it wanted to expand disgorgement beyond its traditional bounds as identified in Lew. And it said that if a statute only takes the word disgorgement, that does not expand the traditional bounds of the equitable remedy, yet that's exactly what Congress did here. Can we talk about the traditional bounds, though? Because I didn't see any case that you're pointing to that suggests that pecuniary harm was a requirement traditionally. So can you help us to understand where that's coming from? Sure. I think it actually, if you look at both at Kokesh before Lew and Jarkissi after Lew and the cases cited in Lew itself, disgorgement is always tied to some party that has a superior right or entitlement to some kind of proceed. So it could be a pecuniary harm. Someone has been injured, and the proceed that the defendant now holds is rightfully theirs. It could be a situation like copyrights or patents, as we saw in the Sheldon case, where the Court says someone used the property, and part of the property right comes with a right to the proceeds. So that if you don't return the proceeds, then in fact that is a loss. That is a pecuniary harm. I understand, but in Lew, didn't we leave open the question at issue here? I mean, didn't we say that the parties have not identified authorities revealing the traditional equitable principles, what traditional equitable principles govern, for instance, when the wrongdoers' profits cannot practically be dispersed to the victims? In other words, in a situation in which you have disgorged the profits, but it is impracticable or infeasible to give them to the victims, we left open whether or not disgorgement was still available under those circumstances. So why doesn't that cut against your view that traditionally there would be no disgorgement available? Your Honor, the language addressing feasibility is addressing a very limited exception, where there happens to be, for some reason, we can't get money to the right party. No, I understand, but your argument is that there is no disgorgement in a situation in which there has been no harm to the parties, to the victim. And I appreciate that you say this is a different circumstance. It's where there's been harm, but somehow it's infeasible to get the money back to them. But it does seem to me to cut against your view when here we've left open whether or not disgorgement is available in a situation in which the money is not returnable or can't be returned to any victims, or maybe when there is no victim in any meaningful sense. Your Honor, I wouldn't let the tail wag the dog. That is truly a very limited, unusual exception where you have a situation, for example, where each shareholder is entitled to 25 cents, and you can't figure out, how can we even put the stamp on the envelope to send them the money? Now, if you look at Part 2 of Lew, I think it does, in fact, provide the exact analytical foundation necessary to decide this case. Does it provide a case that says that pecuniary harm was a requirement under traditional equitable principles? What it said, Your Honor, and I think if you look at the different predicates that go into Lew, I think this does establish this. It can't be a punishment or deterrent. And, in fact, if you're providing a windfall and you don't have a compensatory function, then you are punishing and you are deterring, and then you're simply taking a disgorgement. Why is it a punishment if we're not taking anything more from the defendant than he unlawfully gained? In other words, I could see a fine or a punishment if the defendant is actually paying out of his pocket some money that was rightfully his. That's a punishment. But if we're just disgorging his ill-gotten gains, I guess I'm not sure I understand why that's a punishment. I think two key answers, Your Honor. The first is that it's still depriving the wrongdoer in the same way that a penalty is a punishment and does deprive the wrongdoer, even if it's only targeting, say, half of his net gain. It's still a punishment. It's depriving him of money he didn't have that was never his. Why is that a punishment? It's a punishment because the purpose is to deprive and the purpose is to deter. And the Court was very clear, both in Lieu and in Jericosy, that if the purpose isn't remedial, if the purpose isn't to restore funds to the proper owner, to the wronged party, then, in fact, it does cross that line into a penalty. Mr. Geiser, I'm a little bit confused by your argument, okay, on lots of levels. But let's start with the first. At one point in your brief, you agree that disgorgement should be measured by the defendant's wrongful profits rather than the victim's losses. Do you agree with that? We agree that that is part of the equation, Your Honor. Well, I don't know why it's not the whole equation, meaning one of the reasons to do disgorgement instead of a victim coming to prove losses is because sometimes it's hard to quantify the loss, so you use an alternative. Disgorgement, correct? Well, yes and no, Your Honor. You can't do both, right? You can't do both, but... Right, and you can't do both because, I thought, that what you're compensating is the invasion of the legal right. Correct? Yes, but I think... Let me take you step by step. So you're not debating that the victim's legal rights were invaded here, correct? We're not debating that they had a legal right invaded. We are debating that they have a right to the proceeds in question. The problem I have with that is that we've said, and Justice Thomas himself said in Lehman, that even with profit-based remedies, without a showing of pecuniary loss, can be included in the compensation of compensatory relief. The whole idea behind lost profits is you took my money and you made money from it. You're not entitled to that because you invaded my right to have that money, and maybe I wasn't as smart as you or as corrupt as you, and I didn't make that money, but you took it from me. You invaded my legal rights, so I'm entitled to be compensated. I don't think that's quite right, Your Honor. When you're entitled to lost profits is when there is some legal right or entitlement that gives access not just to the property but to the proceeds from the property. So what normally gives right to disgorgement? Well, normally if you look at a case like, think about patents or copyrights. You have a right to the patented invention. You have a right to the copyright, the invention. So you're thinking that slew of common law cases that weren't patents or patent cases where lost profits were a measure of loss for victims, that those were all wrong? No, not at all, Your Honor. In every single case that I think the government cites and the government's amici cite, it involves a situation where the party before the court who's asking for disgorgement says, I have a legal entitlement, a legal right to those proceeds. That's very different than this situation where Congress made a determination looking at these very victims in this setting with this type of harm trying to get these proceeds that they would lose. They have absolutely no legal entitlement to the proceeds in this case. So is your position, and you said it in your reply brief and I'm a little confused by it, that in your reply you say that if there is only provable loss of $1, then the maximum measure of disgorgement is $1? That's exactly right. So basically what you're saying is the government has to call every victim, prove every dollar of loss, why bother? Why bother asking for disgorgement if they have to prove loss to that amount? I thought disgorgement was to make it easier as an alternative. No, Your Honor, not in this context. And again, remember the context. This is the SEC who's a stranger to the transaction, who has the option while they're enforcing the security laws, and they can seek penalties where they can get full gross proceeds from the wrongdoer, if at the same time they want to try to compensate the victim, then they can seek disgorgement. If they think it's difficult to add up those losses and to figure that out, one, seek civil penalties. So does this all come down to is the SEC going to keep the money or if the order says you pay it to victims, if they say you pay it to victims, then they can do this? Your Honor, I will say what the court said in lieu, which is you have to provide a fair compensation to the person wronged. Fair compensation doesn't mean a windfall. It doesn't mean exceeding the amount of right that the person has to the proceeds. This is a compensatory remedy. It's about restoring the status quo, and it's about not providing windfalls. I'm sorry. No, please. Well, putting aside the question whether after Congress's most recent enactment, disgorgement under that provision has to be equitable, let's assume that it still has to be equitable. There were forms of equitable disgorgement, right, including an accounting for profits. And you say that under such a claim the victim has, quote, an underlying substantive entitlement to the profits. So why doesn't the SEC have a substantive entitlement to the profits after the enactment of the current statute? Well, because I think all the current statute does is give the SEC the right to seek disgorgement as this court then necessarily defined disgorgement in lieu. As an equitable remedy that can't be a punishment, it can't be a deterrent. And the SEC is not seeking disgorgement for itself. It's seeking disgorgement for the injured parties. And, again, I think under that reading, Your Honor, if you do look at disgorgement as simply saying we can deprive the wrongdoer of an ill-gotten gain, first, that's the first principle in lieu that was checked by the countervailing principle in lieu that it has to be a compensatory remedy for a victim. The SEC is not the victim. And you also have the situation where you collapse the distinction in D.3 between civil penalties and disgorgement. I don't think the court has to go beyond the four corners of the statute to read the language the way that we're reading it. Congress delineated the statute. Well, the statute as it currently stands doesn't say equitable disgorgement. It just says disgorgement. And disgorgement, by its very nature, is equitable. There were legal forms of disgorgement, were there not? I don't believe so, Your Honor. Disgorgement, as Liu explained, by its very core is an equitable remedy. So I don't think you can say that, in fact, that this is now a second form of punishment. And if you do read the statute that way, then, again, you're collapsing the distinction between penalties and disgorgement, even though Congress delineated between those two things. Under our reading, each has a separate function. If I could just interrupt you, I just want to make sure I understand it, and this goes back to Justice Thomas's first question. You're saying that there is no situation in which disgorgement is appropriate where compensatory damages would not also be appropriate. Is that right, that disgorgement can never go above compensatory damages? No, Your Honor, and I do want to be clear about this. There are some situations where, by the nature of the way damages are calculated, an injured party could be better off by seeking the net profits, the net proceeds, instead of seeking a damages remedy. But the two overlap. Tell me where we're talking about, because the only thing I've heard from you is situations in which disgorgement doesn't come up to the level of compensatory damages. But how could disgorgement, in your view, go over the level of compensatory damages? I think if you look at the copyright and patent cases, like the Sheldon case, those are examples where someone, for example, might have written a play, but they absolutely have no ability to produce a movie on their own. A studio comes in, misappropriates their protected, copyrighted play, and you might want to seek the net profits from that, as opposed to trying to seek damages because you couldn't sell your play to a studio for the same amount. So there are situations where you could see daylight between the two, but I think what really matters here is that if you look at what Congress was trying to do, and when you pair disgorgement and penalties in the same subsection, they must have different functions, and I think those functions collapse. If you're saying, well, disgorgement and penalties, I guess what I'm focusing on is disgorgement and compensatory damages, because my understanding of disgorgement, you said it's an equitable penalty, it's an equitable penalty, so it was. But it was meant to operate in places where compensatory damages would not operate. That's the whole point of it being equitable. You couldn't get it legally at law, but you could get it by way of this equitable road. Sure, Your Honor, but in all of those situations, what you're trying to get is you've identified some asset, property, funds, money, whatever it is, and you say, I have a right to that asset because I have an underlying substantive right to it. There's a matter of property, there's a matter of patent, there's a matter of trusts and beneficiaries of fiduciary law. There's something that gives the injured party the right to the asset in the same way that if I put $100 into an interest-bearing bank account, and the bank returns $100 to me without the interest, I think I've suffered a loss, and I can seek to recover that interest. That's all those cases say, and you could have situations with damages where you've suffered beyond that proceeds. You could have situations where your tangible concrete harm might be less than the gain that someone produced by misappropriating something that belongs to you. But again, what we're dealing with here, though, all of these, in every single case, the remedy is, in fact, compensatory. It's not designed just to deprive someone of an asset. It's designed to compensate an injured party. And again, that makes sense if you look at the statute under D3, and especially if you fast-forward to D9. But what about the fact that the compensatory language and the focus of Lew with respect to compensatory seemed rooted in the language of D5, that at the time, Justice Thomas mentions this, that D5 was the only thing on the books, and we say in Lew that this is really about the, quote, appropriate or necessary for the benefit of investors language, which appears in D5 but not in D7. Exactly, Your Honor. That comes in Part 3 of the opinion. And if Part 3 were the only part of the opinion, I think this would be a harder case for us. In Part 2, the Court is focused exclusively on traditional equitable rules. It has nothing to do with the language of D5. And even when the Court did get to D5 in Part 3, it stressed, if you look at page 90, it said it applies both because of the specific language of D5 and traditional equitable constraints. Counsel, can I? Oh, sorry. Please, go ahead. This kind of dovetails with Justice Jackson's question and goes back to Justice Thomas's question. Let's say that I don't read Lew the way you do. Let's say that I read it more like Justice Jackson was just proposing. Do you then say, well, I still win because just the word disgorgement, even though it's been taken out of D5, still has these traditional equitable limitations. So is Lew kind of unnecessary? Obviously, it helps you if it's squarely, would require us to decide this case in your favor. But take Lew out of the equation. Tell me why your argument would still carry today. Well, I think we can win in any of three independent paths. First, if we want to re-litigate first principles about what disgorgement means and how it functions as an equitable remedy, I think we can win on that. I think if you read Lew our way and then you understand that Congress ratified Lew, which I think is the only plausible way to understand what Congress did when it takes a term this court just defined, I think it's taking this court's understanding of that term, not some scattershot body of district... Okay, but you're going back to Lew, if you can't rely on Lew. If I can't rely on Lew, then, again, I think we can do first principles or you can just look at the statute itself. I think the best reading of the statute when you pair civil penalties with disgorgement is you have to delineate between the two. They each have to mean something different. Under my friend's reading, Congress would have simply rewritten the statute to say the FCC can seek civil penalties up to gross proceeds, net proceeds, or both, because that's how they read the idea of disgorgement. It's simply about taking away the asset. We read it to have a remedial function. But penalties don't have to be limited to net proceeds or gross proceeds. I mean, penalties could be entirely detached from that. Oh, absolutely, Your Honor. But my point is, though, that the way the government is understanding the addition of disgorgement to D3, it's indistinguishable from a second penalty. Okay, last question. Do you... The Ninth Circuit said that your victims or your clients' victims had suffered a violation of their legal interests. You agree? Of their legal interests, but that does not give them a legal right to the proceeds. Those are two different things. And we know that from other provisions of the securities laws. If they filed suit saying, we have a right to the proceeds, unlike the plaintiffs in all of the other equity cases that my friend cites, the investors here would lose because they have no injury. And I do just want to also supplement this because if the court does just want to look to the statute, I think the easiest way to resolve a statutory case is sometimes to look at the statute. One thing we haven't talked about is D9. And in D9, and this was an addition that Congress included when it added D7, Congress made clear that the fact that we are now empowering the SEC to seek disgorgement does not mean that we're precluding the ability of a private investor to file their own lawsuit. Under my friend's understanding, that is a very odd provision. Why would Congress be concerned that a remedy that simply lets the SEC deprive a wrongdoer of an ill-gotten gain, they don't have to give it to anyone, they don't need to show any harm, they can just take it. Why would anyone even think that might preclude the ability of a private litigant to file their own lawsuit? But under our reading, where disgorgement is designed for a compensatory function, where the SEC invokes disgorgement in order to compensate an injured investor to stand in their shoes and seek recovery on their behalf, that's where Congress would be concerned, that now that we've armed the SEC to do this, maybe a court might think that private parties can't seek that identical relief on their own. So I think if you just look in the four corners of the statute itself, I think we have the better reading. I think we certainly have the better reading, after Lou, and respectfully, I really do think if you read part two, it says there are two principles. One is you can deprive a wrongdoer of an ill-gotten gain, but then it said there's a countervailing principle. Countervailing, the idea of that term, is it's cutting back or restricting. And the countervailing principle says you have to provide fair compensation to the person wrong so that it does not cross the line into a penalty. Under my friend's view, this is a penalty. This is taking an asset that someone has and it's depriving them of their asset for the sole purpose of depriving them of what we don't think they should have, we're casting judgment, and to deter someone from breaking the law in the future. If the SEC wants to seek that kind of remedy, they have the ability to do it, invoke a civil penalty, but then you have to provide a jury trial, you have to satisfy under the facts and circumstances that they're entitled to that kind of relief, and they can't just do an end run, which is, I believe, what the SEC is doing now. If all you need to do to get a disgorgement remedy is come to a court, you don't need a jury trial, you can overestimate the amounts of the gains, as they did here, they asked for over $4 million and the court found over $2 million of that was inflated, and then you coerce defendants to settle because they don't have much of an option when they're facing that kind of demand from the government. Thank you, counsel. Justice Thomas? Justice Alito? Wasn't the aim of the scheme that your client admitted when the consent decree, when he agreed to the consent decree, to obtain from the people who bought the artificially pumped-up stocks money that they owned? In other words, didn't he aim to obtain money from... Wasn't it his intent to make them victims? Your Honor, I don't know if that was his intent or not. What I do know is... But it's inherent in the scheme, is it not? But you still need to have an actual injury to see compensation, which is why if those investors, if an uninjured investor, even if a wrongdoer says, I'm going to target you and I'm going to try to get your money, I'm going to try to trick you into buying this stock, if the stock price goes up, it never drops, they don't have any injury. So Congress made the determination that those investors are not entitled to recovery. The very recovery that the SEC says as a windfall, they are entitled to. Well, is it your claim that they didn't suffer an injury or that it's just too hard to prove that they suffered an injury because the stock could have gone up and down for a million other reasons? Your Honor, in this case, the contention is the SEC didn't prove that there was an injury at all. And if you look on page 10A of the appendix, footnote 4, the Ninth Circuit cast doubt on the SEC's ability to show any injury here because they proved an artificial inflation but no drop. But our contention below, and this is if you look at page 28 of the record, is that the SEC also didn't do the work that it has to do if it wants a disgorgement remedy under a proper reading of disgorgement to actually track down who is owed what so that the disgorgement order doesn't cross that line into a windfall and a penalty, which makes it impermissible as an equitable remedy. Justice Sotomayor? I know you think you can win on three grounds, and I don't want you to panic, but assuming you were to lose, there's two grounds. One would be that disgorgement as an equitable remedy never required proof of pecuniary loss, and there's certainly quite a bit, besides Restatement 3, quite a bit of treatises and cases that support that conclusion. Or we could say that 78 U.D. 7 has taken out any equitable, doesn't require pecuniary loss because it's setting forth just compensable legal invasion of a legal right. Which of the two would you prefer to win on? Oh, lose on, I'm sorry. Well, I would prefer to win on any of our three grounds, but if we lose, we lose, Your Honor. I think you can write the opinion however you'd like, but I'd like to try to take on... Wouldn't it be easier if we wrote it as that 78 U.D. 7 is different because then your pecuniary, your penalty argument would be stronger for your Seventh Amendment claim? Possibly, Your Honor, but I want to try to also just give the Court some guidance on the collateral damage that could happen depending on how you write the opinion. So if you were to write an opinion against us that says that when Congress used the word disgorgement, the word that this Court had just defined in lieu, that Congress was adopting the rejected, repudiated body of lower court decisions instead of this Court's understanding of that term, I think that's going to create a lot of confusion about what Congress needs to do in the future when they're trying to ratify this Court's decisions. I don't think that's how Congress would have acted, especially after lieu made unambiguously clear. I think for whatever disagreement we have about what lieu means, there was a sentence in lieu that said if a word appears in a statute, if the word disgorgement appears in a statute, it does not expand it beyond its traditional common law bounds, and that's exactly what Congress did here. So I think that path will create confusion. It didn't do just that. It just took parts of what lieu said and didn't take other parts of it. It took limiting damages to what this defendant has done and it took the word disgorgement, but it didn't take the language we actually analyzed, which was payment to victims. Your Honor, that language that Congress didn't take is embedded, it's implicit in the definition of disgorgement. There was no need to include that language, and I think that argument would be stronger. So why did we bother analyzing that? Why did I bother analyzing that language in lieu? Why so much emphasis by me in lieu on the importance of that language to our determination? Your Honor, I think that Your Honor did a wonderful job in Part 2 of the opinion, which would have been sufficient. No, it's just I didn't in Part 1. And then Part 3 then, Part 3 was the belts and suspenders. Now, I think that argument would make a lot more sense if D-5 said disgorgement for the benefit of investors. Now, that would be entirely redundant. There are reasons Congress doesn't speak like that. But D-5 says equitable relief for the benefit of investors. That's the entire universe of equitable remedies. Thank you, counsel, so you don't care which way? Well, I care a little.  Well, what we're trying to do is have us both construe the common law correctly, and to be very clear, too, because I do want to... Counsel, assume you're losing. Which of the two arguments would you like to lose on there? Well, look... I don't want you to backtrack into why you should win. I want you to give me a clear answer, okay? But, Your Honor, I think to explain which argument we prefer to lose on, it helps to actually march through what that would mean. I've explained why I think the statutory argument would be dangerous. I think the common law argument would also be dangerous and create confusion. All of the cases that you're suggesting that don't involve a pecuniary loss, they involve a legal entitlement to the proceeds, and that doesn't exist here. So I think Your Honor's going to have a difficult time squaring... That's assuming that 78UD doesn't give them... D7 doesn't give them that legal entitlement. If it gives a legal entitlement that changes and redefines the core definition at its irreducible core of what disgorgement is by simply using the word disgorgement, then I think Congress is going to be very confused on how to write statutes going forward. Okay. You still didn't give me an answer, but thank you. Justice Kagan? Justice Gorsuch? Just to follow up on that briefly, Mr. Geiser, is it fair to assume that Congress legislates against the backdrop of the common law? I think so, Your Honor. And is it fair, when it uses a word like disgorgement that we just used in lieu, do we usually assume that Congress understands what we've just done? Yes. And so the linkage between that and having to prove that there's investors out there who've been injured, not injured, that their money, their legal right taken, causally connected and identifiable and return the money to their benefit, at least where it's not infeasible, we would understand Congress to have meant all that when it used the word disgorgement, don't you think? I absolutely do think. Thank you. Justice Kavanaugh? On your first principles argument, do you respond to the amicus brief of the professors, Laycock and others, on that succinctly? Because they say you're really quite wrong about the first principles. Well, I'll try to respond as succinctly as possible. I think the first point is that they say when you're trying to restore the status quo, you're looking solely at taking the funds away from the wrongdoer. And we made clear that there's that countervailing principle that you have to provide fair compensation to the person wronged. And I think it doesn't make much sense to say you're restoring the status quo by taking money here and giving it a windfall somewhere else. That's not leaving things the way they were. That's fundamentally shifting how this looks. And if you don't like my reading of Lew, hopefully you'll like my reading of Jarkissi, where Jarkissi was very clear on pages 123 and 124 that an equitable remedy, and scourgement is an equitable remedy, the scholars in their brief agree with this, involves restoring the victim. It's about returning assets to the injured party. And you don't restore the status quo unless you're giving that money back to the person who's been injured. So I think that the scholars' brief is fundamentally incompatible with what this court wrote in unequivocal language in Jarkissi. I also think that ultimately we agree with the outcome of every case they cite. The real disagreement between us and the scholars' brief is one of pure semantics. When I look at, if I put that $100 in a bank account and the bank gives me back my principal without any diminution of value, I get every dollar but I don't get the interest that I'm owed, I look at that as an economic loss. Now the scholars would say, oh, that's not an economic loss, that's something else. We both agree that if you have a legal entitlement to the asset, then you get it through disgorgement. You can disgorge the asset to the extent that an injured party has a right to that asset. And we're just disagreeing with what we're calling that sort of missing profit. But that doesn't change the analysis, it just changes the terminology. Next question, what do you think Congress was trying to accomplish in 2021 when they enacted that statute? We think that the best reading is they were trying to reattach a limitations period to the SEC's disgorgement authority. And the government doesn't take issue with that point. They agree that once Lew said that disgorgement has to be a fundamentally equitable remedy, it can't be a punishment, it can't be a penalty or a deterrent, that took away Kokish's holding that the penalty five-year limitations period applied. So the SEC was left facing absolutely no deadline whatsoever. Now the government says, well, there are lots of ways Congress could have written that statute. I think it would be very strange to include, as the government suggests, a new limitations period for disgorgement, which at the time is a remedy that isn't mentioned anywhere in the statute. As a matter of simple housekeeping, it makes far more sense to say we're going to create a new limitations period for disgorgement, so we need to include disgorgement somewhere in the statute so that we're making clear there's something here that the SEC has a timeline on which to seek. Last, do you want to say anything about Seventh Amendment implications of the government's position, if any? I think that the government kind of has a difficult path, no matter how they answer that question. I'm guessing my friend is going to say that their version of disgorgement, despite looking entirely penal, will not be subject to a jury trial. The Seventh Amendment rights won't kick in. I think if they take that position, then that shows the SEC is trying to set up a penalty with an end run around an actual penalty in the statute. And if the government does concede now that their version of disgorgement would require a jury trial, that just further collapses the distinction in D.3 between disgorgement and penalties, which are two very different terms, different concepts. I don't know why Congress would have added disgorgement if all it's supposed to do and all it needs to do is simply deprive the wrongdoer of net proceeds. That looks like a penalty, just with a different cap. Thank you. Mrs. Barrett? Why does that look like a penalty if all you're taking away is the ill-gotten gains? So they're the proceeds that the wrongdoer isn't entitled to in the first place. As opposed to being entirely punitive because it's going above and beyond. Why would that necessarily be a penalty? Anything is a penalty if the point is to take it away from you. We're making a judgment that you weren't entitled to this and we're taking it from you. What makes it remedial is you're giving it to the right party. But that means there has to be a right party to give it to. There has to be some party with a right to it. And again, look to Lew. And if you don't like Lew... I like Lew. I'm sure Justice Sotomayor will appreciate that. I don't necessarily like your reading of Lew, but I like Lew. Well then, hopefully you'll like, again, my reading of Jerkesy. Jerkesy is crystal clear. Look at pages 123 and 124 of the opinion. It's dividing that same line between a legal remedy and an equitable remedy. And it says that something is a punishment if it's not restoring the status quo, which means returning the funds to the injured investor. It's not enough just to deprive. If you deprive, that crosses the line into a punishment. And again, I don't think that the SEC could credibly say, we're not trying to put you in the red. We don't want gross proceeds. We're just going to take away net proceeds or half of net proceeds. Suddenly it's not a penalty, it's not a punishment because we're not going over the line into punitive damages. It's about the point of taking it away both to deprive someone, we need to deprive someone as a punishment, and to deter. And again, my friend in his brief, he's very clear. The purpose of taking it away is to punish and deter. Deterrence, as Kokish said, as Lou said, as Jerkesy said, all of these cases agree. Deterrence is a penal function. Justice Jackson? So I guess this idea of trying to characterize something as penal or not is confusing in this context because I had understood the relevant distinction to be between compensatory damages, which is the idea of making the victims whole, versus disgorgement, which is divesting the defendant of the ill-gotten gains. And one thing that you haven't touched upon at all is the very traditional equitable principle of unjust enrichment, which would seem to me to fit squarely into the equitable concept of depriving the defendant of their ill-gotten gains. And that, I thought, was what the scholars were talking about, that is a traditional equitable principle, not a legal one in the way that you've been defining it. I guess you could characterize it as a penalty, but it doesn't seem to matter because traditionally, courts have been able to exercise their equitable authority to deprive the defendant of ill-gotten gains, which they term unjust enrichment. So can you speak to that? Sure, and I apologize if I sound like I'm repeating myself. Jarkissi and Liu make clear that if that's all you're trying to do is deprive that ill-gotten gains, that's the first principle that Liu identified. But Lisa, there are two principles, and one is a countervailing principle. To avoid making that punitive, which is where Jarkissi comes in, Jarkissi makes absolutely clear... So you're saying unless we do this in the way that you're talking about, the Jarkissi case, which is not a common... I mean, it's like our case from a couple years ago, right? The idea of the Seventh Amendment is what we're avoiding with this concept. I guess I just don't understand why the first principle isn't all we need with respect to resolving the issue in this case. Let me try it this way. I think that it's a very traditional principle going back centuries, if not longer, millennia. We cite a Roman case in our brief that is that equity doesn't serve punitive functions. The role of equity is not to penalize... Alright, but what about the unjust enrichment concept? Do you agree that that was an equitable concept, unjust enrichment? No? It's not? No, no, no, it is. So what does that mean, unjust enrichment? In the statute... No, in common law. What does unjust enrichment mean and allow the court to do? The unjust enrichment has, I think, two components. One, someone has to be enriched, and they have to be enriched unjustly. Now, in order to recover the unjust enrichment, you need to find some claimant with an entitlement to those proceeds. Equity doesn't award windfalls. I can't come into court as a random stranger saying, hey, I saw someone do something wrong. My time is short. How does finding the claimant and identifying their loss help us to know whether or not it was unjust enrichment from the standpoint of the equitable determination that this defendant should not be allowed to retain this amount of money? Your Honor, the reason you find those victims and determine their loss is because that's the core function of disgorgement. It's to get the asset from the person who shouldn't hold it to the person who should. Thank you. Thank you, Counsel. Mr. Stewart? Thank you, Mr. Chief Justice, and may it please the Court. I'd like to make three quick points at the outset. First, I think it's important to unpack what Petitioner is trying to accomplish here. Petitioner is attempting to make it as difficult as possible for the SEC to pass disgorgement awards over to victims, and Petitioner is trying to do that by urging the Court to adopt the narrowest possible conception of victim. And then second, Petitioner is asking the Court implicitly to resolve in his favor the question that this Court left open in lieu, namely, if it is infeasible to pass disgorgement along to victims, can the money be put in the Treasury? And only by succeeding in both halves can Petitioner prevail. And so even under subsection D-5, this goes well beyond anything that the Court held in lieu. The second thing is, it's just wrong to say that the Court in lieu interpreted the term disgorgement. The Court had no occasion to do that because the term disgorgement didn't appear in the statute D-5 that the Court was applying. When the Court said, under traditional equitable principles, the government has to, in order to collect disgorgement, the SEC has to pass funds along to victims if it is feasible to do so. The Court didn't say, otherwise it wouldn't be disgorgement. The Court said, otherwise it wouldn't be consistent with what courts of equity have typically done. And if you look at dictionary definitions, Black's Law Dictionary, for example, you look at restitution and you see lots of entries about passing from a wrongdoer funds or property that rightfully belongs to someone else. If you look at the Black's Law Dictionary definition of disgorgement, you just see an act of giving up. It's the surrender, full stop. And so disgorgement is the word Congress would use if it wanted to make it as clear as possible that what we care about is getting the defendant to give up its gains and that any question about where the money goes after that is secondary. And then the last thing I'd say very quickly, petitioner would fundamentally transform the disgorgement remedy from one that is designed to deprive the defendant of ill-gotten gains and is measured by profits into a compensatory remedy in which the measure of recovery is losses to the victims. I welcome the Court's questions. Wouldn't you have a cleaner argument if you would accept the notion that this is a legal remedy? It might be cleaner, and we don't think our position depends on whether the remedy under D3A2 and D7 is legal or equitable. That is, as long as we were operating under D5, which refers specifically to equitable relief, then we could get disgorgement under that provision only if we could persuade a court that it was equitable. But the whole thrust of what Congress did in 2021 was to say we want the SEC to have a remedy that compels the defendant to give up its profits on the following conditions, whether that is regarded as legal or equitable. And so the question whether it's legal or equitable may have implications for whether you get a right to jury trial, but it doesn't have any implications for whether you can get the remedy at all. But doesn't it look a lot less like an equitable remedy if you keep most of it? What percentage of the disgorgement do you keep now? Does the SEC keep? I mean, I think we pass along a high percentage of monies that are actually recovered. Now, the figures that are cited in petitioner's brief, I think it's on page 8, they cite a press release and they say it shows that $6.1 billion was seized in a particular year. In fact, that was the amount that was ordered disgorge, not the amount that was actually collected. So my understanding is something like 88% of funds actually collected were designated for distribution. I think the process takes time, and so that's not a guarantee that they would actually be distributed. But I think our practice is to distribute a high percentage of the funds we collect to people we regard as victims. Now, petitioner would make it more difficult for us to do that by saying the only victims we can legally distribute funds to are people who could establish their own right to sue under the private cause of action. Counsel, several times in his opening brief, your friend looked at our recent case in Jharkhasi and we heard it cited several times this morning. You don't cite it at all in your brief. Do you want to talk about why it's not relevant at all here? I think the reason we didn't regard it as relevant was that Jharkhasi was focused on under what circumstances could the SEC impose monetary remedies in its own administrative proceedings? And here the question is, what can the SEC get when it sues in court? And so the SEC kind of has to go before an Article III court. We have to persuade whoever the finder of fact is that there is liability. The court itself will determine the disgorgement amount. It won't be reviewing our assessment of disgorgement under a deferential standard. So it's not really the same question that was presented in Jharkhasi. Well, I thought his point was that your argument would treat the case as if it were a case like Jharkhasi. I mean, if that's his argument, I don't think it's right because the whole rationale for the court striking down what was done in Jharkhasi was that it had been done in an administrative tribunal acting without a jury rather than by a court. No, I mean not for the jury question, but more in terms of how the sanction, the disgorgement or anything else would be treated. The other thing that I would say is different between this case and Jharkhasi is that in Jharkhasi we were recovering civil penalties. And civil penalties are often used to make the defendant worse off than he would have been if he hadn't engaged in the violation in order to create punishment and extra deterrence. And here the disgorgement award is limited to the amount of the defendant's unjust enrichment, his net profits. It's limited to amounts that the defendant actually received as a result of the violation. Mr. Stewart, just to follow up on the Chief Justice's questions, yes, Jharkhasi concerned administrative proceedings, but it also concerned the Seventh Amendment. And so the question I think the Chief is trying to aim at is, okay, you've got this D-7 remedy, but when might it trigger a jury trial rather than remain before the judge in equity? And I just want to make sure I understand a few things. One, you agree that D-7 is for net profits only, right? Yes, and I think that's made clear in D-3A. Looking at D-7 by itself, you could say yes works for me. Right. Okay. Two, you agree that the unjust enrichment has to be causally connected to the defendant's actions as a result of the defendant's actions is what you say in your brief. Can you stand by that? Yes. Okay. And then third, and the kind of key one that I think your friend on the other side's been talking about is where the money goes after that. And to keep it in equity, you've got to get it back to the investors unless it's infeasible, we said in lieu. And do you stand by that? I would quarrel with that part of it. What the court said in lieu... So you think you can get a disgorgement without any effort to get it back to the investors and keep that in equity in front of a judge rather than trigger a jury trial right as a penalty? Yes or no? It's a two-part question. No? It's a one-part question. We would say yes, but I think it's a... Yes, you can keep it in equity before a judge without a jury and make no effort to send the money back to investors. That would be our position. Okay, let's say that's wrong. Okay? Let's say the equitable remedy was all about restoring investors. Let's say we think that. Then what? Then I think it would follow that under D3, A2, and D7, we can still get disgorgement without routing it to investors, but it would be considered a legal remedy. And then there's a jury trial right. So you agree with that? So you agree that if you don't make an effort to get it to investors, there's a jury trial right? We don't agree with that. Hold on. Which is it? That's why I said it's a two-part question. We agree that the statute would permit us to get it without routing it to investors because D3, A2 lists certain prerequisites and routing to investors is not one of them. Our position would be that would still be equitable and no jury trial would be available. I know there are arguments on the other side that not routing it to investors would... I think that's pretty perilous, Mr. Stewart. I think if you want the equitable remedy, you've got to behave and without a jury trial right, all of equity, you've got to follow the rules of equity. If you want a legal penalty, then the 7th Amendment might have something to say about it. Again, I'm... We said that in lieu, right? That is traditional equitable practice. Well, in lieu, you said at the outset that when we get, when we see a provision that just generally authorizes equitable relief, we ask whether a particular remedy was typically available at equity. Yes, and the government keeping all the money was not typically available at equity. It was getting it back to the investors. Now, maybe D7 authorizes that, but I don't see how it would not trigger the 7th Amendment if the government just decided to keep all the money. I think our argument would be along the lines of what Justice Barrett and Justice Jackson have suggested, that so long as the monetary remedy does nothing more than preventing the defendant from profiting by his own wrongdoing, so long as it simply takes away the illicit gains, then it's not a penalty and no 7th Amendment right attaches, whereas the civil penalty provisions can make the defendant worse off than he would be if he hadn't committed the violation. But again, some penalties make the defendant worse off. Others do not. Others can be very modest. It doesn't matter. You still get a jury trial, right? But, Mr. Stewart, isn't your point that it's a penalty when it makes the defendant worse off? That's the point that Mr. Geiser keeps saying. This is punishment, but it's not a penalty or punishment if what is happening is the defendant is just being made to return the money that he never had access to that was not his to begin with. Yes. And what can happen in the SEC suit is if the court could authorize both disgorgement and a civil penalty, and the disgorgement would ensure that the defendant didn't profit from his own wrong, and then any civil penalty, even a civil penalty in a fairly small amount, would, by definition, go beyond that and make the defendant worse off. Mr. Stewart, let me try it this way. You're asking us to expand D7 beyond equitable practice to allow the government to keep the money. Do we have to decide whether that triggers the Seventh Amendment in this case? Can we reserve that question? Yes. All right. Mr. Stewart, I wasn't, just to be clear, I was just pressing Mr. Geiser, not necessarily saying I agree with you. But, I guess one question that I have is how do we define disgorgement if not looking to the equitable piece of it? And actually, let me just back up and ask you, what is the government's practice with respect to distributing it to victims? Do you only try to restore them by calculating what they actually lost, or do you give them a windfall? I mean, I think it varies from case to case, and I think in some circumstances, they probably wind up with what you might call a windfall. That is, you could have a circumstance, for instance, if somebody, if an investment advisor lies about his credentials in order to encourage clients to sign up with them, and then the clients can't point to anything about the advisor's services that was actually deficient, but the SEC, having received disgorgement, may try to give the people who were deluded some portion of the recovery in order to compensate them for the fact that they weren't told the... But there are circumstances in which the SEC would say, yeah, we're just going to return to victims what they lost so that we can keep the overage? I mean, I think Mr. Deiser referred to one situation in which we might not make an effort at distribution, and that is if you have violations that cause very diffuse harms, so the defendant may make a lot of money and may cause very small amounts of harm to a very large number of people, and the SEC may conclude that the administrative costs of identifying all these people and what each of them has lost is just going to eat up too much of the fund in order for... And that's the only situation? I don't know if that's the only situation, and I, you know, this has been our... Do you know what others are? Because the figures from the last couple of years, as I have them at least, are that the SEC in 2024 collected, sorry, had ordered disgorgement of over $6 billion and returned $345 million. Last year, in 2025, it was $10.8 billion and returned $262 million. Now, I know that's ordered versus collected, but even if you're a reasonably good collection agent and the federal government is a reasonably good collection agent, we all know, let's say you get half of that. That's $5 billion versus $262 million. That's $3 billion versus $345 million. What kind of efforts does the government make to get this money back? I don't think there's any reason to think that we get half of it. What I've been told... You think it's less than half? Yes. How much less? I don't know exactly how much less. I asked the question of, do we know what percentage of the $6 billion, $1.1 billion was collected, and we're not sure of the answer. Well, so do you know that it is less than half, or you just don't know? Well, I've also been told that of the amounts collected in, I think it was 2024, it could have been 2025, I believe it was 88% was designated for a distribution. That doesn't mean it would necessarily have been distributed at the end of the day, but that was something that we intended to do. And it's a long and time-consuming... Both the collection and the distribution can be a long and time-consuming process. You're getting this from the SEC? Yes. I mean, the other thing I would say about the equitable principles, you're representing 88% of the money that's actually collected is distributed, is designated for a designated, in a particular fiscal year. How important is the distribution part of this analysis to your argument? I mean, I had understood that you were differentiating disgorgement from civil penalties. So, just in a very simple analogy, this defendant steals a million dollars from a bunch of people. And disgorgement would say you can't keep that million dollars. The court could both order him to give back the million dollars that he stole and fine him for having engaged in that behavior. That would be the civil penalty part, right? It's coming out of his own pocket. It's making him worse off because he's now fined. And you're saying you'd have to have a jury trial for that part of it, the penalty part. Is that correct? We would have to have a jury, even under our view that disgorgement wouldn't require a jury. If you were seeking civil penalties as well, you would need a jury trial. Okay, so we have a million dollars ordered to give back. We have, let's say, a $100,000 fine. You'd have to have a jury trial for that part of it. In terms of the give back, is it your position that whether that money goes to the victims or goes to the government, that's really not a key aspect as to whether or not disgorgement can be ordered? It's key under D-5, but not under D-3, A-2, and D-7. It's really not relevant at all, in our view, under D-3, A-2, and D-7. And the reason is traditional equitable principles are not limits on Congress's power. The reason that traditional equitable limits played a key role in lieu was that the statute itself referred to equitable relief. And so to determine what sort of remedies Congress had implicitly authorized, the Court looked at what Courts of Equity had traditionally done. But Congress can always create new remedies or adjust the terms on which existing remedies will be available, and that's what it did in D-3, A-2, and D-7. It said you can get disgorgement of any unjust enrichment that is received by the defendant as a result of the violation. As distinguished from D-5, which really said something about benefit of the victim. It had two pieces of operative language. First was there was language at the end of the provision about for the benefit of investors, and the Court in lieu also suggested that just the reference to equitable relief might require some effort to compensate victims because that was the way it was typically done. The other point I would make is Mr. Stewart, before you go to another point, I just want to capture this one. Do we even need to decide that question? You said we don't need to decide the Seventh Amendment question if you keep the money. Do we even need to decide whether D-7 authorizes you to keep the money? To answer the question presented is just simply do we need to show injury to the investor? We could answer that hypothetically in your favor, no. Without deciding the scope of whether D-7 permits you to extend beyond equity to keep the money. Couldn't we do that? I think that's correct. The other point I was going to make about Lew and about typical equitable practice is that when Lew was asking what courts in equity had typically done, they looked at a broad range of cases involving different subject areas. Because most litigation in this country is private litigation, the court in Lew looked mostly at private suits. In private suits, it's understandable that any money recovered from the defendant is going to pass to a victim because the only person who's a proper plaintiff is going to be a victim, someone whose own rights were violated by the misconductor who is injured in some way by the violation. It's normal in private civil litigation that if there is an award that the defendant paid money, it will be paid to the victim in order to redress his injury. Those are good reasons in private suits to expect that the money will go to victims. When Congress was drafting a disgorgement provision specifically for SEC enforcement suits, it needed to decide to what extent do the rules that have applied in private suits translate over into SEC enforcement actions. With the other two restrictions this court had announced, Congress incorporated them into the statute. It incorporated the term unjust enrichment to make clear that it's net profits, not gross receipts, and it incorporated the limitation that we can get disgorgement only of unjust enrichment received by the defendant. Both of those really go to the core purpose of disgorgement. Disgorgement is intended to ensure that the defendant does not profit by its own wrong, but it's not intended to go beyond that by making him worse off than if he hadn't committed the violation. The other limits that the court announced in lieu were intended to draw that line. Therefore, it's understandable that Congress incorporated those into the new SEC-specific statute, but didn't incorporate a limitation that the money has to go to victims that seems more in keeping with what we would expect in a private suit. If I could just understand, you've been talking about this, but your decision to lead with D-7 rather than D-5, my question is, what are you worried about on D-5? Why do you think that D-7 is a better argument? Why do you think that D-5 is a comparatively weak one? I think the biggest problem from our standpoint with D-5 is the question that the court left open in lieu, namely under D-5, can we get disgorgement if it is infeasible to distribute the profits to victims? I mean, the disgorgement to victims. And the fact that the court left it open means there's some possibility that we would lose that issue at the end of the day. And that would put kind of a substantial damper or potential damper on our disgorgement efforts because there would be lots of questions about, is it feasible? Mr. Geiser is arguing that if the only victims we can find are people who didn't suffer pecuniary harm, then it really isn't feasible to pass along the money to victims because they don't qualify. And so part of the value of D-3A-2 from our standpoint is it just takes that question off the table. It says you can make the defendant surrender his unjust enrichment, net profits, so long as they are profits that the defendant received and so long as he received them as a result of the violation with no inquiry into where the money is going or where we could have routed it if we had wanted to. Mr. Stewart, I'm a bit confused by your answer for the following reason, okay? If we go your route, D-7, then the Seventh Amendment issue looms large because then the government keeping the money and not paying over to victims as compensation, okay, then serves only one purpose, deterrence. And if it's only deterrence, I think you have a much harder way to go to say that it's not a Seventh Amendment violation to let the judge decide it. I guess kind of looking ahead to a hypothetical case in which we were litigating the Seventh Amendment question, we'd say a couple of things about that. The first is the paradigmatic equitable remedy is a prohibitory injunction, and a prohibitory injunction has no legitimate purpose other than to deter the defendant from future misconduct. And so I don't think the Court would stick to a rule, a categorical rule, that if deterrence is a substantial motivation, the remedy can't be equitable. The second thing I'd say is 11 years ago in Kansas v. Nebraska, this Court exercising original jurisdiction ordered disgorgement as an equitable remedy and fixed the disgorgement number at an amount greater than... But that was the victim receiving the money. The victim did receive the money, but the Court fixed the amount at a sum greater than the victim's loss. Well, that's because I agree with you that at equity, you could measure the victim's compensable damages by unjust enrichment by the defendant. No question. And windfall profits have always been recognized in equity for unjust enrichment or disgorgement concepts. But if the government is receiving the money, what legally protected right did you have to the money? I mean, the point I was going to make is the Court in Kansas v. Nebraska in explaining why it made sense to set the disgorgement award at that amount said it will provide additional deterrence to future breaches of the contract, the compact. The parties were in an unusual situation where the water was more valuable to the upstream Nebraska... I'm accepting that if you are a victim who has a legally invaded right, you are entitled to also deterrence. But if the government is keeping the money, what legally recognizable right is it protecting? It is simply accomplishing a public interested effort to deprive the defendant of his lawful profits. For purposes of deterrence, not compensation, that's my point. I think substantially for purposes of deterrence, but I think kind of independent of the utilitarian justification, there is a sense that it is inherently unfair, inherently inequitable to have an adjudicated violator and say you can keep the money. But then the other point I'd like to make in response to your question is to why in some circumstances we like D3A2 better is that if push comes to shove, we would rather be in a situation where we can get disgorgement but may have to go through a jury trial to get it than to be in a position where we can't get it at all. And the petitioner's argument is that we can't get it at all except to the extent that it corresponds to identified pecuniary losses on the part of... That's assuming we accept as underlying premises that equity required proof of pecuniary loss. If we disagree with that, that solves the case. And we're happy to win the case under D5 and we think we should win it under D5 because even looking at that provision, the petitioner's argument goes substantially beyond. Thank you, counsel. Thank you. Thank you, counsel. Justice Thomas, anything further? Thank you, counsel. Thank you, counsel. Thank you, Mr. Chief Justice. Rebuttal, Mr. Geiser? Just a few quick points, Your Honor. The first is my friend says we're trying to make it as difficult as possible to get funds to victims. That is not our goal. Our goal is to simply delineate between penalties and disgorgement. And if the government thinks it's hard to distribute funds, then they do have the option. Seek civil penalties. You can deprive us of every penny, including up to gross proceeds that we've collected, or rely on the very inventive, very powerful private securities bar, which is very good at filing lawsuits when someone is actually injured to recover and compensate an injured party. Now, my friend, I think, equivocated a little, but I think the bottom line answer is that the government does not believe that disgorgement requires returning funds to investors. That is a penalty. Then the government is seeking a penalty. It is indistinguishable from penalties. It looks exactly like the penalty in D3, just with a different cap. That is not the way that Congress writes statutes. And I do think, Justice Gorsuch, that you do need to decide whether the government can keep the funds or not, because that's defining what is disgorgement. We can't just kind of put it in this empty vessel and say, in this case, they can deprive wrongdoers a profit, but we're not going to say what disgorgement means. We're not going to square disgorgement with D3 and the fact that Congress drew a stark distinction between civil penalties and disgorgement, even though I think that distinction collapses under my friend's read. I don't think my friend has any answer for D9. If Congress's point here is simply to deprive wrongdoers of a gain and has nothing to do with remedial function, they can keep it, they don't need to pay the funds back to investors, then I don't know why Congress would have been concerned that anyone would have even imagined that somehow empowering the SEC to seek effectively a second penalty, that they were precluding private investors from bringing their own lawsuits. That reading of D9 doesn't make sense. Our reading does. Under our reading of D9, Congress would have been concerned that because the SEC now has separate authority explicitly ratifying exactly what Lew, I think, under its best reading said, to seek fair compensation on behalf of injured individuals, that would be an exclusive way for private parties to recover. And Congress wanted to make clear, no, that compensatory function that the SEC now has doesn't take away the right of private parties to seek that same function. I don't think it's a plausible reading of Congress's amendments in 2021 that they were adopting two-thirds of Lew, and then by negative implication, implicitly redefining in D7 without saying a word about it the very core of what  So, we don't have that compensatory function of taking an asset that someone took that doesn't belong to them and it belongs to someone else. We are taking that asset and returning it over. The final point I'd like to make is that if you do look to D3, and my friend has said a lot about unjust enrichment, but D3 still says you can seek disgorgement under paragraph 7. If it's not disgorgement under paragraph 7, then you can't do it. You start with saying what is disgorgement and then say this is the amount that you are disgorging. And I think Congress used that language in D3 because it simply was trying to come up with some way to describe the amount that you were taking as a disgorgement remedy and redistributing to an injured investor. If there are no further questions. Thank you, counsel. The case is submitted.